STATEMENT OF FACTS
The plaintiff in error, plaintiff in the court below, commenced this action to recover the sum of $3500.00, a balance *Page 545 
due upon an executed contract for the furnishing of oil mill machinery. Said sum is admitted to be due the plaintiff, unless the defendant is entitled to recoup in damages for a breach of the contract in failing to deliver the machinery during the last days of July, 1902, and not until the 20th day of September, following.
The defendant by way of answer and cross-petition answered the petition of plaintiff as follows:
"In the District Court of Cleveland County, Oklahoma Territory.
"W. P. CALLAHAN COMPANY, PLAINTIFF, v. CHICKASHA COTTON OIL COMPANY, DEFENDANT. a corporation.
"ANSWER AND COUNTER-CLAIM.
"Comes now the above named defendant, and for answer to the plaintiff's petition herein, denies each and every allegation thereof not hereinafter admitted, and admits that the said defendant is a corporation, as alleged in the said petition, and that at the time stated herein it purchased from the said plaintiffs the wares and machinery described in the contract, and admits that the said plaintiff furnished the said defendant, under the terms of said contract, the goods described therein.
"Second, that said defendant, further answering and by way of counter-claim against the said plaintiff, states that it admits the execution of the contract set out in plaintiff's petition, and that the said plaintiff furnished the said defendant, under said contract, wares and merchandise therein described, and the said defendant further stated that, at the time of the execution or the making of the said contract, the said defendant's business was the manufacturing and selling *Page 546 
of cotton seed oil and other products of cotton seed from cotton seed purchased by the said defendant for said purpose. That the said defendant, for said purpose, had in the year 1898, erected and constructed at the city of Chickasha, in the Indian Territory, a complete cotton seed oil mill, which said mill was completed in the month of March, 1898, and was by the said company defendant operated throughout the seasons of 1898, 1899 and 1901, and until the month of March, 1902, when a large portion of the same was destroyed by fire, and that, on account of the said destruction by fire, the said defendant entered into the contract set out in plaintiff's petition with the said plaintiff for the said plaintiff to furnish and supply articles in said contract described for the purpose of replacing the machinery and appliances that had been destroyed by the said fire; and the said defendant states that the said plaintiff well knew and understood at the time when said contract was made, and for a long time prior thereto and at all times subsequent to the making of the same, how defendant's business was conducted, and the purpose for which the said machinery was wanted, and that, notwithstanding the agreement contained in that said contract that the machinery should be shipped by the plaintiff in the latter part of the month of July of the said year, or sooner if possible, and the persistent requests of the said defendant that such shipment should be made within the time provided in the said contract, the said plaintiffs delayed the shipment of a large portion of the said machinery until the _____ day of September, A.D. 1902.
"That the said plaintiff had prepared and furnished plans for the building in which the said machinery so contracted to be furnished by defendant should be placed and installed and operated, and the said buildings had been and were by the said defendant constructed in accordance with the said plans furnished by the said plaintiff for the reception of said machinery, and it was impossible for the said defendant, *Page 547 
when it became known to it that the said plaintiff would not furnish the said goods, wares and machinery within the time prescribed by the said contract to purchase or secure from any other source suitable machinery, which could be installed and operated in said buildings, and the said defendant was on that account compelled to wait until the said plaintiff should and did furnish the said machinery sued for herein.
"That at said time the said defendant had invested in the said cotton seed oil mill and equipment the sum of ninety-four thousand dollars ($94,000.00), and, by reason of the delay of the said plaintiff in furnishing the said machinery in accordance with the said contract, the said defendant was unable to place the said machinery and start the said mills until the 1st day of November, said year. Whereas, at and after the making of said contract, and the reliance upon the terms thereof under the agreement of the said plaintiff to furnish said machinery by the latter part of July, the said defendant had made arrangements to start the said mill by the 15th day of September, in said year; and the said defendant, by reason of said delay of said plaintiff in furnishing the said machinery, was compelled to allow the said mills to stand idle from said 15th day of September until said 1st day of November, in the said year, or a period of forty (40) working days; and that the reasonable rental value of the said establishment for the said period of time was fifteen thousand nine hundred eighty-four and 82-100 dollars ($15,984.82).
"The said defendant further states that, in the years subsequent to the original construction of the said mills, it had established a large business as a manufacturer of various products of cotton seed and as purchaser of said cotton seeds in the open market. That there was during all of the year of 1902 a market for cotton seeds and the products thereof, and the said cotton seeds and each of the products *Page 548 
thereof had during all of the said time a generally known market price and value.
"That said mills were of such capacity that they could, and, if ready for operation by the said 15th day of September, in said year, would readily have handled and manufactured into the various products thereof within the said forty working days so lost by the said defendant in the operation of said mills by reason of the delay in furnishing said machine, three thousand four hundred (3,400) tons of cotton seed; that cotton seeds during the said period from September 15, 1902, to November 1, 1902, sold on the open markets at fifteen dollars (15.00) per ton in the territory conveniently near to the said defendant; that the freight rates thereon during the said period from the gins where the same were to be had to the said mills was one and 59-100 dollars per ton; and the said defendant could, during the said period, with the said mill, had the same been in proper working order, have manufactured the said cotton seed into its various products at an average cost of three dollars ($3.00) per ton, and, but for the delay on the part of the said plaintiff hereinabove set out, was prepared to do so.
"Said defendant alleges that the earning capacity of the said mill in the same time during which it was so compelled to stand idle awaiting the said machinery was more than the sum of fifteen thousand nine hundred eighty-four and 82-100 dollars ($15,984.82) hereinabove by plaintiff alleged to be the rental value of the said establishment.
"Said defendant further states that the principal business of the said defendant is the manufacture and sale of machinery used in the manufacturing of cotton seed oil and cotton seed meal and other products of cotton seed, and that the said plaintiff was at the time of the making of said contract, and long had been, familiar with the usages and customs of such business and the methods of operating such *Page 549 
mills and that at the time of the making of said contract knew that the business of said defendant required it to enter the markets at the opening of the ginning season, to-wit: about the middle of August, and purchase cotton seed to be used and manufactured into cotton seed products by said mill during the manufacturing season. And the said plaintiff at said time well knew that the business of all manufacturing institutions at that time was and must be conducted in said manner.
"Said defendant further states that at the commencement of the ginning season in said year, relying upon the plaintiff's promise to furnish the said material at the time in said contract and agreement stated, said defendant entered into the markets and purchased large quantities of cotton seed to be used in the manufacturing business aforesaid, and directed that the same be shipped to its said manufacturing establishment at Chickasha, Indian Territory. That, on account of the delay in the furnishing of the said machinery by said plaintiff, the said defendant was unable to use the seed and work the same up as they arrived, and was compelled to store the same, and for said purpose was compelled to expend the sum of one thousand eight hundred twenty-seven and 5-100 dollars ($1,827.05) as extra expenses of storing cotton seed, which it was unable to work during the said season at Chickasha, and which it would have been able to work had said machinery been properly provided as the same was received. And the said defendant alleges that the size and capacity of its storage rooms and warehouses and the character of cotton seeds and their tendency to heat and spoil were well known to the said plaintiff at the time when the said contract was made.
"Said defendant further states that, by reason of said delay, it was compelled to handle and rehandle large quantities of seed which had been received, and which it was unable to work up, and for the purpose of preventing the same *Page 550 
from heating and spoiling; and was compelled to and did expend for said purpose the sum of one thousand fifty-two dollars ($1,052.00), all of which expense was caused by said delay on the part of the said plaintiff. That said defendant was also by said delay compelled to store large quantities of seed which it had purchased at gins, and which, on account of its inability to operate said manufacturing establishment it was unable to handle, to-wit: one hundred (100) cars, at an expense to said defendant of two dollars ($2.00) per car, and was thereby damaged to the sum and amount of two hundred dollars ($200.00). That, by reason of the said delay and defendant's inability to handle and manufacture the same, twelve hundred (1,200) tons of cotton seed were damaged by heating, and the said defendant, by the exercise of the utmost care and the great expense hereinabove set out, was unable to prevent such heating and damage. That, by reason of said seed being damaged, the product thereof was of an inferior quality, and the said defendant was compelled to sell the same below the market price thereof, and was thereby damaged to the sum and amount of four thousand and ten dollars ($4,010.00), the difference between the market price of said product had the seed from which the same were manufactured been in good condition, and the price at which the said defendant was compelled to sell the same.
"The said defendant further states that, by reason of said delay a large quantity of seed which had been purchased by the said defendant to be manufactured at said plant, to-wit: eighty-two (82) tons, did become heated and spoiled and became unfit for any use except that the said defendant was able to sell twenty (20) tons thereof at $10 per ton; that the value of the said eighty-two (82) tons of said cotton seed, which spoiled as aforesaid, was one thousand five hundred fifty-eight dollars ($1,558.00), and the said defendant received from the sale of the said twenty (20) tons the sum of two hundred dollars ($200.00), and the said defendant was therefore damaged in the sum and amount of one *Page 551 
thousand three hundred and fifty-eight dollars ($1,358.00) by reason of the loss of the said seed, which became spoiled in the manner aforesaid. That, had said plaintiff furnished the said machinery within the time specified in the said contract, the said defendant would have been able to properly care for all of the seed which it had purchased with the warehouse which it then owned, and without additional or extra expense, and would have been able to manufacture the same into proper products thereof without loss or inconvenience.
"Said defendant further, by way of counter-claim, states that, by reason of the delay of the said plaintiff in furnishing the said machinery at the time stipulated in the said contract, the said defendant was compelled to keep a large number of skilled mechanics, whom it had employed to install the said machinery, for a period of fifty (50) days longer than their services would have been required had the said machinery arrived and been installed at the proper time, and was compelled to pay said employes the sum of eight hundred eighty-four dollars ($884.00) more than it would have been required to expend for the purpose of installing the said machinery, had the same been furnished within the time provided in said contract.
"Wherefore, the said defendant says that the said plaintiff ought not to take anything by this action, and prays judgment against the said plaintiff for the sum of twenty-one thousand eight hundred and fifteen and 87-100 dollars ($21,815.87), with interest thereon at the rate of seven per centum per annum from the 1st day of October, 1902, the costs of this action, and all proper relief.
"BLAKE BLAKE, "Attorneys for defendant."
Upon the trial of the case plaintiff objected to the introduction of evidence in support of said answer, for the reason that the same does not state facts sufficient to constitute a defense, which objection was overruled and an exception *Page 552 
allowed, and afterwards upon the introduction of evidence made specific objection to the introduction of evidence in support of the several items of claims for damages in said answer and counter-claim set forth, which was overruled and evidence received showing damage sustained because of the idleness of the mill for a period of 40 working days which items of damages, upon which proof of damage was introduced, was as follows: 1st, its rental value based upon earning capacity which was shown by the evidence to be about $16,000.00: 2nd, handling cotton seed to prevent spoiling, $670.00: 3rd, damage to cotton seed by heating, $3,672.00: 4th, cotton seed spoiled by heating, $1,271.00: 5th, idle skilled help retained for the purpose of placing machinery upon arrival, $855.15, making a total of $22,468.00. This is substantially the damage proven, and the amount of the several items making up the same.
The court at the conclusion of the trial made no findings of fact or conclusions of law, but rendered judgment for defendant for the costs of the action, and its judgment was based upon the fact that the defendant after all the damages claimed to have been sustained, were sustained, made a payment to the plaintiff of about $4,000.00 upon the contract, and in its letter transmitting the same stated that the balance due on the contract of $3,500.00 was by it held satisfied because of damages sustained in the failure to comply with the contract for supplying the machinery at the time agreed upon for delivering the same, which balance is the $3,500.00 in litigation in this action.
Motions for a new trial were filed by both parties, which were by the court considered and overruled, and exceptions *Page 553 
allowed to such order and judgment, and the case comes to this court by case made.
Opinion of the court by
The defendant in error in its brief says:
"The trial court found generally for the oil mill and assessed its damages at $3500.00 and interest. We cannot tell whether it was for loss of use of mill, or for seed spoiled, or expense incurred, or for all these things in part. By its finding the oil mill was adjudicated favorably as to all. If any one of them is right, no reversal can be had."
We are unable to agree with this contention in view of the record in this case. The evidence was addressed to each of the items of damage specified and objections thereto made on the ground that such items were not provable, were overruled and exceptions allowed. To say now that there is any presumption that testimony so received was not considered in finding a general verdict or in a general judgment by the court without findings of fact upon which it was based, is equivalent to saying that immaterial and prejudicial evidence received over objections thereto will be held immaterial if there was any competent evidence sustaining the judgment, when it is impossible to say upon what evidence the judgment is founded. It is the better rule to hold in a case of this kind, that the trial court in its general judgment based the same upon all the evidence, by it held to be competent of consideration, because without special findings it is impossible to determine otherwise, and in such cases the judgment debtor is entitled to his exception to the admission of prejudicial proof of his liability. See Richardson v. Millish, 3 Bing. 334, 336, cited approvingly by the supreme court of the United States; *Page 554 Parks v. Turner, et al, 53 U.S. 39; Maryland v. Baldwin, et al,112 U.S. 490.
This brings us to an examination of the question as to whether or not upon the specifications of damage set out in the defendant's answer and counterclaim, there was evidence admitted over objections of plaintiff that could not properly be considered and taken into account, in finding the amount of damages sustained by defendant. In such examination our attention is challenged by the first item of damage in defendant's answer stated. To a more complete understanding of this item of damage let it be understood that the defendant was defending against an admitted liability of $3500.00 upon the grounds that the plaintiff having, on May 8, 1902, agreed to furnish it certain mill machinery by the last days of July, failed and neglected to furnish the same until September 20th, a period of forty working days, and this delay defendant says caused it damage in the sum of $15.984.82.
To prove this damage the defendant offered proof, over objections of plaintiff, that the rental value of defendant's mill for the 40 days it was compelled to remain idle by reason of the act of plaintiff in failing to deliver it the machinery contracted for at the time it was contracted to be delivered, was $15,984.82. The proof so offered was the testimony of officials of defendant.
Mr. Wooten testified in part as follows:
"Q. You say the rental value of that property in the beginning of the season for forty days was sixteen thousand dollars and a little over?
"A. I calculated that; yes sir.
"Q. Has the property ever been rented?
"A. No sir. *Page 555 
"Q. Did you ever know of an oil mill in that vicinity being rented?
"A. No sir.
"Q. Did you ever know of an oil mill in Oklahoma or Indian Territory being rented?
"A. No sir.
"Q. How did you arrive at the rental value of the property?
"A. By what it is worth to me."
Mr. R. J. Latting testified:
"Q. Did you ever know of the mill being rented?
"A. No sir.
"Q. Over what states has your oil mill business and your experience in the oil mill business extended
"A. Mississippi, Tennessee, Texas and Indian Territory.
"Q. The fact is, Mr. Latting, mills are not rented, isn't it?
"A. As a rule; I don't know of any of them having been rented."
Mr. Wilhelm testifies:
"Q. What do you mean, Mr. Wilhelm, by saying that you know the rental value of that mill?
"A. Well, I know it by what I could have made out of it with good seed at that time.
"Q. You could have made a profit of $4.00 a ton if you could have bought your seed right and sold your products right?
"A. Yes sir."
From the testimony it is apparent that the witnesses were not testifying from their knowledge of the rental value of any like property, or from their experience as oil mill men looking as best they could into the future and judging its rental value from a fair average of what the use of such property *Page 556 
is worth one year with another; but were, in fact, at the time of the trial, looking backward to conditions as they had existed at a particular time, and which conditions were admittedly the most favorable.
Such testimony, we think, cannot be accepted as a fair measurement of rental value under the circumstances of this case. The contract was made on the 8th day of May, (1902).
Time was not made of the essence of the contract and its provisions in no way provided for a measurement of damages in case of a failure to comply with the terms.
The damages that are recoverable under such circumstances, are such only as may be fairly considered within the contemplation of the parties at the time of entering into the contract.
That they contemplated at the time this contract was entered into the subsequent crop conditions of that year, and the amount of the crop, the price that they were afterwards able to buy the cotton seed for, the price and supply of labor, the favorable condition of the market for the sale of their products, could not be assumed in the absence of some proof to that effect; but all of this was in contemplation of the witnesses when upon the trial of the case they testified as hereinbefore set forth, and when, as shown in the testimony of manager Latting, the reasonable average profit was $4.50 per ton of the seed consumed, and that that was a fair rental value of the property.
We quote from Mr. Latting's testimony in chief the following to show the manner in which the rental value of the property was arrived at:
"Q. What would have been a reasonable average of *Page 557 
ordinary profits in the operation of your mill during this 40 days that you were enforcedly idle?
"A. $4.50 per ton; 85 tons for 41 days would make $15,682.50.
"Q. Why did you mention 85 tons a day?
"A. Our mill was 85 tons capacity; it was possible to run 100 tons a day but 85 tons was the average.
"Q. Mr. Latting, what in your judgment would have been a fair rental value for the Chickasha Oil Mill plant for the first 40 days of the season of 1902?
"A. $4.50 per ton.
"Q. What would be the daily rental value of such a plant during that time?
"A. Something like $300.00 per day. I will tell you more definitely; it would be $382.50 per day."
From this it will be seen that under the guise of rental value the damages resulting from the idleness of the mill were estimated upon the profits that the mill might have made during that time under the conditions which then existed.
If such a method of measuring rental value may be accepted as correct, then, in an action of this kind it is only necessary to wait until the season has passed, determine the profits that could have been earned and declare that to be the rental value of the property. Such a proposition is fallacious upon the face of it. The rental value of a mill in May cannot be determined upon the basis of a crop and market in September following, without such testimony being the subject of a speculation and guess work to such an extent as that courts, generally exclude it in measuring damages for a breach of a contract.
It is true that the provisions of statutes enter into and *Page 558 
form a part of the conditions and liabilities of parties under their contract, but we have no statute authorizing speculative damages to be recovered.
The only statute of Oklahoma touching this subject matter is as follows:
"For the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided by this chapter, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, which, in the ordinary course of things, would be likely to result therefrom. No damages can be recovered for a breach of contract, which are not clearly ascertainable in both their nature and origin." Wils. Ann. St. Sec. 2730.
This statute is only declaratory of the common law rule of measuring damages, and in no way changes or enlarges the damages which the defendant might recoup under the common law for the delay in furnishing the machinery and performing its contract, by the plaintiff, or the rule by which such damages are to be ascertained and measured.
All the evidence in the case was addressed to the amount ofprofits which, under the most favorable conditions, might have been made by the oil mill during the period of delay, and was not of a nature to disclose or determine the rental value of the mill during such term.
By the great weight of authority, profits, or what might be made out of the use of such machinery, do not constitute the true rule for the measure of damages in this class of cases.
The following authorities fully sustain this position:Howard v. Stillwell, et al, 139 U.S. 199; Globe Refining Co. *Page 559 v. Cotton Oil Co. 190 U.S. 540; Choctaw, Okla. Gulf R. R. Co.v. E. A. Jacobs, supreme court of Oklahoma, September term 1905 — unreported; Taylor Mfg. Co. v. Hacher Co. 3 L. R. A. 587;Griffin v. Calver, 69 Am. Dec. 718; Fleming v. Bock, 48 Pa. St. 309; Allis v. McLane 48 Mich. 12 N.W. 640.
The defendant in error relies upon the case of LivermoreFoundry and Machine Company (Tenn.) 58 S.W. 270, which was an action to recover the rental value of a cotton compress forced to remain idle during the season, because: First, on account of the failure of machine company to make repairs within the time contracted for; and second, because of repairing its engine in such defective manner that the head of the cylinder blew out, destroying the plant to such an extent that it lost the season's work.
The case was tried to a jury which found one item of damages, among others, of $3000.00 for loss of rental value of the compress.
We are unable to determine from the case as reported how the rental value of the compress was ascertained.
The court places its judgment upon the fact that the rental value of the compress was proved, and we think there is no question but that if rental value of property can be fairly ascertained, that is a correct measurement of damages for its enforced idleness.
But the court in that case does not question the rule we herein state, and in its opinion uses this language:
"In neither case is he liable for loss of profits; for fluctuation in business, changes in the price of labor and unforseen *Page 560 
accidents to machinery make this as a measurement of damages too uncertain."
And the court in that case further stated in commenting upon the case of Clifford v. Richardson, 18 Vt. 620:
"The defendant put machinery into plaintiff's mill in an unskillful manner, whereby he lost the use of his mill for a long space of time, and was put to great expense in repairing his machinery.
"It was held that both the loss of the use of the mill and the expense of repairs were to be compensated for in damages. In this case, though, the court seemed to allow, as competent, evidence of what the mill could have earned. On this last point we are not to be understood as approving its holding."
In this language we find the Tennessee court holding that the enforced idleness of the mill is recoverable in damages, but holding further that evidence of what the mill could have earned was not competent proof of such damages.
This brings us back to the question we have here under consideration and to the testimony of Mr. R. G. Latting, and defendant's manager, above quoted.
From this and other testimony of like import it is apparent that the rental value attempted to be shown in this case is simply estimated profits on the capacity of the mill for the period complained of, a proposition that is denied by the Tennessee court in Livermore F. M. Co. v. Union F. C.Company, above referred to as well as other authorities cited.
In commenting upon the decision of the Tennessee court we feel that it would not be trespassing to note the distinction of the case it had under consideration from the one we are here considering, for the reason that within common *Page 561 
knowledge there is a marked distinction in this, that the business of a compress is not dependent for its profits upon an open market for its products, as is the case with an oil mill.
In the first its earning capacity is fixed by a specific charge for compressing a bale of cotton, while an oil mill's earnings are largely dependent upon the market for its products.
There is in the consideration of this question another proposition we think deserving of notice. It appears from the testimony that an oil mill does not operate the year around; the period of its operation being approximately 130 to 150 days, dependent somewhat upon crop conditions. If it starts late in the fall it may run correspondingly late in the spring following until the cotton seed which has been stored has been all used or disposed of. In this instance the mill started in November, when but for the delay of plaintiff in supplying the machinery it might have started the latter part of September. After starting it ran until the company's seed was all consumed. Under such conditions we are of the opinion that it is not a correct measurement of damages to show what the earning capacity of the mill was at the ordinary beginning of the season's work, for the length of time it was delayed; but it would rather be the difference between doing its work at that time, and doing it at the close of that season's business, and what if any difference there may be in the expense of so conducting its business.
We can readily conceive of losses in this respect, as the price of oil and the value of seed may change between September and June following, which might cause specific damage.
This phase of the case we do not care to discuss, as we *Page 562 
cannot determine upon what theory evidence may be presented upon a retrial of the case.
Having reached the conclusion that there was material error in the introduction of testimony touching the measure of damages upon the trial, the judgment of the lower court is reversed, and the cause remanded to the district court of Canadian county with instructions to vacate the order of that court overruling the motion for a new trial, and to grant the same.
Irwin, J., who presided in the court below, not sitting; all the other Justices concurring.