GAINES BROS. & CO. v. CITIZENS' BANK OF HENRYETTA et al.

No. 10418—Opinion Filed Nov. 29, 1921.

Rehearing Denied Jan. 24, 1922.

(Syllabus.)

1. **Sales—Breach by Purchaser—Remedies of Seller—Damages—Resale.**

A commodity which one has refused to accept and pay for, according to contract, may be resold by the seller, for the purpose of fixing the amount of his damages caused by the breach of the contract by the purchaser to receive and pay for, with the costs of delivery to him.

2. **Same—Manner of Resale—Discretion of Seller.**

A resale of property is but the mere means of determining the precise amount of damages by the breach, while the incidental effect is to satisfy the loss suffered by the vendor to the extent of the proceeds from the resale. The resale may be made at public auction or privately, and it often happens that the goods can best be sold at private sale; but whether on the one mode or the other, in the absence of any instructions from the buyer, the vendor has the right to exercise his discretion within reasonable bounds, and whether this discretion is exercised properly and in good faith is a question of fact for the jury.

3. **Appeal and Error—Questions of Fact—Findings—Evidence.**

Where a jury is waived, the findings of the court are entitled to the same weight and consideration that would be given to a verdict by the jury, and if there is any evidence, including any reasonable inference, tending to support the findings, the Supreme Court will not reverse for insufficient evidence.

4. **Same—Sales — Damages for Breach by Buyer.**

Record examined, and held, that the judgment of the trial court should be affirmed, and it is so ordered.

Error from Superior Court, Okmulgee County; R. E. Simpson, Judge.

Action by the Citizens' Bank of Henryetta against Gaines Bros. & Company and the Monarch Coal Mining Company. Judgment for plaintiff, and defendant first named brings error. Affirmed.

W. H. Kornegay, for plaintiff in error.

I. H. Cox and Morgan, Pinkston & Hepburn, for defendants in error.

JOHNSON, J. This action was commenced on October 3, 1917, by the Citizens' Bank of Henryetta, a corporation, as plaintiff, against Monarch Coal Mining Co., a corporation, and Gaines Bros. & Co., a corporation, as defendants.

The parties will hereinafter be referred to as plaintiff and defendants, respectively, as they appeared in the trial court.

The parties waived a jury, and the cause was tried to the court, and on July 16, 1918, the court rendered a judgment in favor of the plaintiff against the defendant, to reverse which judgment the defendant Gaines Bros. & Co. has regularly commenced this proceeding in error, making the plaintiff and the defendant Monarch Coal Mining Co. defendants in error.

The allegations in the plaintiff's petition, in so far as the same are material, were as follows:

"That the defendant Gaines Bros. & Co., a corporation, was duly licensed to transact business in the state of Oklahoma, with its principal place of business at Fairland, Oklahoma; that on to wit, June 20th, 1917, the defendant Monarch Coal Minning Company entered into a certain contract with the defendant, Gaines Bros. & Co., by which said defendant, Monarch Coal Mining Co., agreed to sell and the defendant Gaines Bros. & Co. agreed to purchase, to wit, twenty (20) cars of mine-run coal f. o. b. cars at the defendant Monarch Coal Mining Co.'s mine in Okmulgee county, Oklahoma, at a price of $2.99 per ton, the same to be billed to the defendant Gaines Bros. & Co., at Fairland, Oklahoma, and Cardin, Oklahoma, according to the directions of said Gaines Bros. & Co., and it was further then and there agreed between said contracting parties that for all coal shipped under said contract between the 1st and 15th inclusive of each month, payment should be made on or before the 28th of the same month; and for all coal shipped from the 16th to the last day of each month inclusive, payment should be made on or before the 13th of the following month.

"Plaintiff further states, that in pursuance of said agreement the defendant Monarch Coal Mining Co., between June 20th, 1917, and July 7th, 1917 (both dates inclusive), loaded and shipped to said defendant Gaines Bros. & Co. twenty (20) cars of mine-run coal of the kind and quality provided in

said contract an itemized statement of which, showing the dates of loading, description of cars, grade of coal and weights is as follows, to wit: (description of cars omitted.)

"Plaintiff further states that under the terms of said contract there became due from defendant Gaines Bros. & Co., on July 13th, 1917, the sum of $1,886.25, and that of said sum said defendant on June 20th, 1917, paid the defendant Monarch Coal Mining Co. the sum of two hundred ($200.00) dollars, and that on July 28th, 1917, there became due from said defendant Gaines Bros. & Co. the further sum of $390.20, for coal shipped in the month of July, 1917.

"That on June 29th, 1917, this plaintiff loaned to the defendant Monarch Coal Mining Co. the sum of $2,276.45, said loan to bear interest at the rate of 10 per cent. per annum until paid, and as security for payment of said loan, said defendant Monarch Coal Mining Co. assigned to this plaintiff his rights under said contract with said defendant Gaines Bros. & Co., in writing, said assignment in words and figures as follows:

" 'Henryetta, Oklahoma, June 29th, 1917. Gaines Bros. & Co., Fairland, Oklahoma. Gentlemen—You will please remit direct to the Citizens' Bank, Henryetta, Oklahoma, for all coal shipped you by the Monarch Coal & Mining Co., until further notice. It is understood that for all coal shipped from the first to the fifteenth inclusive of each month that you are to remit on or before the twenty-eighth of same month and for all coal shipped from the sixteenth to the last day of the month inclusive you are to remit on or before the thirteenth of the following month. Yours very truly, The Monarch Coal & Mining Co., by H. Lantz, President.'

"That on June 30th, 1917, the defendant Gaines Bros. & Co. accepted said assignment in writing, said acceptance being in words and figures as follows:

" 'Fairland, Oklahoma, 6-30-1917. The Citizens' Bank, Henryetta, Oklahoma. Gentlemen:—We accept the above order and agree to all conditions written therein. Very respectfully, Gaines Bros. & Co., by Frank Gaines.'

"Plaintiff states that there became due and has been due from said defendants ever since the 28th day of July, 1917, said sum of $2,276.45 but that although demand has been made on defendants for payment, they refused and do still refuse to pay the same or any part thereof, with this exception, that on July 23rd, 1917, the defendant Monarch Coal Mining Co. paid this plaintiff the sum of five hundred ($500.00) dollars for which due credit has been given. That on July 23rd, 1917, there had accrued against said defendant Monarch Coal Mining Co. the sum of $19.00 interest. and that there is due now from said defendant the sum of $1,795.45, with interest at 10 per cent. from July, 1917, and from said defendant Gaines Bros. &

Co., the sum of $1,776.45, with interest at 6 per cent. from July 28th, 1917.

"Wherefore, plaintiff prays for judgment against the Monarch Coal Mining Co. for $1,-795.45, with interest from July 23, 1917, at 10 per cent. per annum, and against the defendant Gaines Bros. & Co., for $1,776.45, with interest from July 28th, 1917, at 6 per cent. and costs of suit."

The separate answer of the defendant Gaines Bros. & Co. was as follows:

"That the defendant Gaines Bros. & Co. did not on June 20th, 1917, or at any other time, enter into any contract to buy from the Monarch Coal Co. any coal or at any time did it enter into any contract with the said Monarch Coal Co. to buy any coal. It further says that at no time did it agree with said coal company or any one else to pay $2.99 per ton for coal or any sum for coal. It admits signing a statement similar to the one set out, but says that at no time did it buy any coal of the Monarch Coal Co., but avers the fact to be that orally it did agree with the Monarch Company to handle for it some coal consigned to it at Cardin on a commission of eight per cent., with the distinct understanding that the coal should be good quality mine-run coal. That seventeen cars were consigned, but the defendant did not buy any of it. That the coal was not of good quality and was not according to the standard. That said Monarch Coal Co. sent to the defendant billing for said coal at the price of $2.99 per ton, but defendant refused to receive the same or to handle the same on said terms, but in order to reimburse itself did dispose of one car and the net proceeds were $77.70, and there is still due from said Monarch Coal Co. the difference between two hundred dollars and $77.70, with interest at six per cent. from June 20, 1917, amount to $4.62. That the remainder of the coal was taken in charge by the Monarch Coal Co. and the proceeds as the defendant is informed and believes were by said coal company which sold the coal applied towards the payment of the debt of the said company to the plaintiff. This defendant denies that plaintiff on the 29th day of June loaned to Monarch Coal Co. any sum; it is informed and believes that at said time the defendant on an old debt was indebted to the plaintiff, but the exact amount it does not know. That this defendant is not indebted either to the Monarch Coal Co. or to the plaintiff, but the Monarch Coal Co. is indebted to it in the sum of $132.30 principal and interest at six per cent. from June 29th, 1917, at six per cent., in all $136.92, with interest at six per cent per year from January 29th, 1918. It asks for judgment against said coal company for that amount and for costs of suit and all other relief."

The separate answer and cross-petition of Monarch Coal Co. were as follows:

"This defendant admits all the allegations contained in the plaintiff's petition and here and now consents that judgment may be entered against it for the sum of $1,795.45, with interest from July 23rd, 1917, at the rate of 10 per cent. per annum and costs of suit."

### Cross-Petition.

"For its cross-petition against the defendant Gaines Bros. & Co., this defendant states, that on June 20th, 1917, it entered into contract with the defendant Gaines Bros. & Co. as alleged in plaintiff's petition by which it agreed to purchase, to wit, 20 cars of mine-run coal, f. o. b. cars at this defendant's mine in Okmulgee county, Oklahoma, at a price of $2.99 per ton, to be billed to the defendant, Gaines Bros. & Co., at Fairland, Oklahoma, and Cardin, Oklahoma, according to the directions of said defendant, Gaines Bros. & Co.

"This defendant further states, that in pursuance of said agreement and between June 20th, 1917, and July 7th, 1917, both dates inclusive, it loaded and shipped to said defendant said 20 cars of mine-run coal of the kind and quality provided in said contract, an itemized statement of which showing the dates of loading, description of cars, grade of coal and weights are as follows: (omit description.)

"This defendant further states that under the terms of said contract there became due from the defendant, Gaines Bros. & Co., on July 13th, 1917, the sum of $1,886.25 and that of said sum said defendant on June 20th, 1917, paid to this defendant the sum of $200.00 leaving a balance of $1,686.25; that on July 28th, 1917, there became due from said defendant Gaines Bros. & Co., the further sum of $390.20, for coal shipped between the 1st and 15th of July, 1917, under the terms of said agreement."

"This defendant further states that on June 29th, 1917, the plaintiff advanced him the sum of $2,275.45, secured by an assignment of his contract with the defendant, Gaines Bros. & Co., as alleged in the plaintiff's petition, said assignment being in words and figures as follows; [which was the same as pleaded by the plaintiff in its petition.]"

"This defendant further states that after having shipped all of said coal heretofore alleged to said defendant, Gaines Bros. & Co., and after payment therefor had become due as by terms of said agreement he demanded settlement from said defendant, said defendant then and there refused to pay the amount due or any part thereof. That at that time said coal had reached its destination and that said defendant, Gaines Bros. & Co., without any cause or excuse whatever notified this defendant that they would not unload or pay for said coal according to said agreement. That at that time demurrage was rapidly accruing against said coal to the extent that unless some prompt disposition could be made of it such demurrage charges would amount to the full value of

the coal, whereupon this defendant disposed of such portion of said coal as he found still loaded in said cars at the best price obtainable at that time and in that locality, and received therefor the sum of $500.00, that in making such disposition of said coal he incurred the expense of to wit, $250.00, and that defendant, Gaines Bros. & Co., is entitled to credit of the amount due for the difference between said amount received and said expense, amounting to $250.00. That said defendant, Gaines Bros. & Co., is now indebted upon said contract in the sum of $50.00 with interest from July 28th, 1917, of which the sum of $1,776.45, interest from said date, is due the plaintiff and the balance is due to this defendant."

The replies of the parties to these answers and cross-petitions consisted of a general denial.

At the conclusion of the argument, the defendant Gaines Bros. & Co. requested specific findings of fact in its favor upon all issues in the case, which request was complied with by the court, but finding against contentions of the defendant Gaines Bros. & Co. on each.

The defendant Gaines Bros. & Co. filed a timely motion for a new trial herein, makes 36 specifications of error, but only the following are argued in brief of counsel and relied upon for a reversal:

"First. That the judgment is without evidence in fact to support it.

"Second. That the judgment is without legal evidence to support it.

"Third. That as a matter of law when the court found that the property was sold and delivered at Dewar, the question of resale on account of defendant passed out of the case, and the admitted act of Lantz had the legal effect of rescinding the contract of sale, and there could be no recovery.

"Fourth. That the finding as to expenses was wholly unsupported by the evidence, and shows that defendant in the Henryetta court did not get a fair and impartial trial."

These propositions will be considered together; 1, 2, and 4 go to the question of sufficiency of the evidence to support the findings and judgment of the trial court.

The defense of the defendant Gaines Bros. & Co. was outlined by its counsel at the beginning of the trial in his opening statement as follows:

"By Mr. Kornegay: Our proof, Your Honor, substantially will show that we dealt with Mr. Lantz of the Monarch Coal Mining Co.; he was to consign some coal to us, which he did; we were to sell it at eight per cent. commission. We got some of that coal, we couldn't use it, it was slate and not coal. We started in to sell it, and the men turned it back, wouldn't handle it, couldn't burn it, the fires went out with that coal, that factories shut down—so we wired Mr. Lantz to come up. He came up and sold it, that sale—we had nothing to do with it. We were going to get a commission out of it and he went off and sold it. Of course the equities of the Citizens' Bank are no higher than the equities of Mr. Lantz—we never bought it, and never sold it."

Mr. H. Lantz, witness for the plaintiff, testified substantially as follows:

"I am president of the Monarch Coal Co. and as such handle and transact all business matters. I have personal knowledge of the transaction alleged in this lawsuit. I met Mr. Frank Gaines at Dewar on June 20th, 1917, last year, was introduced to him by J. T. Buckner of Muskogee; Mr. Buckner told me that Mr. Gaines was wanting to buy coal. At that time we had, I think, about twelve cars of coal on the track that were not billed. I told him we had this coal and be glad to sell it to him. There was ten cars of this coal in the Dewar yards, nine or ten, I forget, wouldn't say positive which, nine or ten cars in the Dewar yards. I took the car, Frank Gaines and I went down and inspected the coal on the cars, went all over it and then took him out to the mine; we had two cars loaded at the mine. He looked at the coal and agreed to take it at $2.99 a ton, and gave me billing instructions on it, and I billed nine or ten cars on that date. He agreed to take the coal and asked me to ship it, give me shipping instructions and agreed to give me $2.99 a ton, f. o. b. Dewar. He said he believed that if I would let him take it at eight per cent. he believed he could get me more money; I told him I wasn't able to take chances, we were hard up and needed the money to do business, rather sell it outright and arrange so we could get our money for it."

Plaintiff's "Exhibit B" being bill of lading for car C., R. I. & P. No. 89148, billed by Monarch Coal Co. at Dewar, consigned to Gaines Bros. at Cardin, Oklahoma, Mr. Lantz testified as follows regarding "Exhibit B":

"This was one of the cars that Mr. Gaines looked at, and was billed according to his instructions."

At this point in the testimony it was admitted that plaintiff had bills of lading corresponding with those set up in the petition, and that the introduction of the remainder might be waived to save incumbering the record.

Mr. Lantz, continuing his testimony, stated that all of the cars set out in the answer and cross-petition and in plaintiff's petition as having been billed out on June 20, 1917, were the cars of coal that Mr. Gaines looked at and bought on that day, and that the two cars shown to have been billed out on

June 20 were the cars that were loaded at the mine when he and Mr. Gaines drove down there; that all of the coal was shipped out according to Mr. Gaines' instructions, the destination shown on the bill of lading being the destination to which he was instructed by Mr. Gaines to send it. As to the other cars shown in the petition as having been loaded and shipped from the 22nd day of June to the 7th day of July, they were shipped in accordance with his instructions at that time; he was directed by Mr. Gaines to ship them all that way unless further advised differently. It was all the same kind of coal that Mr. Gaines examined on the cars, the same grade, and to be paid for at the same price. Three of these cars were shipped to Fairland, Oklahoma, on his (Gaines') instructions, and Mr. Lantz was advised by Mr. Gaines to ship the balance to Cardin. This was mine-run coal, which was selling at the mine anywhere from $2.85 to $2.90 to $3.25, some selling a little bit higher, at $3.35.

"Mr. Gaines on that day gave me $200.00; I told him we needed this money; wanted him to pay me more; he said that was all he could pay me until he got back home. With regard to 'the circumstances by which this order came to be given on Gaines Bros. will say that we needed the money for our pay rolls and bills, and I went to the bank and asked the bank to loan me this money, if Gaines would accept an assignment; Mr. Whitenton told me he would gladly furnish the money, if Gaines' credit would justify the acceptance, so in a day or two he told me he would accept it, he gave me the money and I sent the invoices to Gaines at the time and took an identical copy of it to the bank, and the bank gave me credit for it and I used the money. * * * That is a usual and customary method of doing business among mines and banks in the coal fields of Oklahoma. The dates of payment, twice a month, as set out in the order of acceptance are usual and customary modes of payment for coal shipped in the coal business in Oklahoma. Mr. Gaines gave me the $200.00 at the time he inspected the coal that was in the cars at Dewar after we had come back from the mine and after he had inspected all that was loaded. Gaines Bros. never paid anything under this order. We expected them to pay every day, I think it was due about the 13th, consequently we did not say anything about it for a day or two, as anybody would, you know. The bank was willing to pass it for a day or two, expected a check or draft in the mail. Along about the 14th or 15th I got a wire from Frank Gaines to go to Miami and find a man by the name of Skelton, supposed to be working for him, and help me dispose of the coal; he was busy in the harvest field and wasn't able to look after it. I got the message in the evening; it was too late to get the evening train to Miami. I got up there and nobody to meet me. I stayed around there, thought I had probably missed him, the hotels were crowded, hard to get a place to stay. I put in a long distance call at Fairland and tried to get hold of him, and I didn't get him that day. The next morning after that I went out to the field, tried to locate this man, Skelton, finally did locate Skelton, but Skelton seemed to be without very much information about the coal, he didn't seem to be very much of a coal salesman, didn't seem to have any particular interest, only Gaines had turned it over to him—been working for the M. K. & T. railroad as station agent, he had come in there, didn't make any particular effort to sell the coal, looked to me like a hard situation, approximately a thousand cars in the Miami field waiting to be sold on the tracks, demurrage accumulating, and I got pretty nervous, drove back to town and called up Mr. Gaines, got him, but he said he was too busy to come up there. I didn't know what to do, first thought I would just leave it go, let him do whatever he could, and I got on the train and come back to Henryetta. I went back up again next day. I phoned Frank Gaines and he drove up to Miami and met me there at the hotel. It looked bad, and I asked him what he was going to do about it, looked pretty bad for me, the bank wanting their money, something had to be done in connection with them, the bank expecting their money and I was expecting him to live up to his agreement— if there was anything I could do to help him I would be glad to do it. He said: 'Hell, the coal ain't no good, anyway; just take it and do what you please,' and drove off and left me standing right across the street from the hotel. I didn't know what to do, the demurrage accumulating, so I went over and saw an attorney and asked his advice, the demurrage accumulating and the coal on my hands, and asked him what to do. He said: 'You show good faith, do the best you can, sell the coal and put in your claim against Gaines Bros. for the balance.' That's what I done. I didn't see any chance for me selling it; I took a car and drove out the second day—drove out two different days, to different dealers, and found that most of the dealers in that vicinity were pretty well stocked with coal; I couldn't get any conversation out of them, had all the coal they wanted or had regular men they bought from, and didn't care to bother with me, so I went back. I was pretty much discouraged and disgusted; I saw George Rice, he represents the Interstate Coal Co. at Miami, and handles a great deal of coal in that field. I asked Mr. Rice to make me an offer. 'Well,' he says, 'you see the situation here.' We went down and checked up the demurrage. Finally he says, I hate to see it go; if you see your way out of it, I will give you a dollar a ton; and he paid the five hundred dollars on the coal, and said he would send the balance later. 'All right,' I said; I took

the five hundred dollars and applied it on the account. Later, I understand, that Gaines Bros., or somebody, after Rice agreed to take the coal, after I sold the coal to Rice, I think they took two cars of coal before Rice got to them. That reduced the amount that Rice was to pay me by the amount of those two cars, and he never paid me any more money. Up to the time I saw Mr. Gaines at Miami he had never made any complaint about the character or quality of the coal. At that time all of the coal was at destination and had been there, some of it, for fifteen or sixteen days, maybe longer —all of it had been there six or seven days. We figured the demurrage against the coal at, say, a dollar or a dollar and a half a ton, and by the time it could be disposed of the demurrage would be at least two dollars a ton. On these two trips I put in about seven or eight days; the first trip I think I stayed up there three days, or possibly four, wouldn't say positive; the next time, about three days before I got Rice, I drove around up there three days the last time, I think. I think the railroad fare was in the neighborhood of twenty dollars, on the two trips; my hotel expenses was thirty dollars anyhow; my car hire in the field somewhere in the neighborhood of twenty-five or thirty dollars; telephone messages about ten or twelve dollars. During the time I was gone the Monarch Coal Co.'s mine was unable to run; they closed down, closed down when I left and did not run until after we had the thing straightened up, the coal disposed of up there, then we started up again. If I had not been there they would have been unable to run and get out the coal. I had charge of the sales of coal, and during the time I was gone I was not able to handle the daily sales for the Monarch mine, and closed the mine down. This was necessary for the reason that the railroads were fighting us on no-bills, wouldn't spot us if had no bills on hand; I wasn't there to look after the bills, had no other way— had to close down until I got back, until I could dispose of the coal that we loaded. The railroad wouldn't spot us cars where we had no bills. The reasonable and probable amount of the loss of the Monarch Coal Co., by reason of my having to be gone all that time, was approximately $50.00 a day, on an estimate of the earnings of the Monarch at that time when they were running."

On cross-examination he further testified:

"The day I met Frank Gaines at Miami I called his attention to the fact that he had not sent the bank any money, they were expecting it every day, and asked him what he was going to do about it, they had asked me to see about it—something to that effect. After I asked him about the money he drove off and left me. He said the coal was no good; he refused at that time to have anything to do with it. I told him if there was anything I could do to help him dispose of it I was right willing to do it. When I sold

the coal to George Rice he assumed what demurrage there was against it. George Rice gave me a check for $500.00 and I turned it to the Citizens' Bank and told them to give credit to Gaines Bros. on the money they had advanced me on the coal. On the occasion of my first talk with Gaines I told him I had coal to sell, some on the track at that time, be glad to sell to him; he wanted to go and look at it, and he and I went down and went over the coal that was there, went over every car of it; he pronounced it all right, bill it to Cardin, which I done. A car will average forty-four to forty-five tons, in this forty-five to fifty two tons. He wanted to know if I would rather take eight per cent. If I could he believed he could get me a little more later on, he thought he could get more money for me if the coal market would continue to go up; believed the coal would net me more than $2.99. At the time I made the contract I believed that Gaines Bros. was a responsible concern. Since then this Mr. Skelton told me they were crooked, would beat me if I did not watch out. When I went to consult the attorney at Miami, he told me the same thing. With this in mind I was doing everything I could to protect the Monarch Coal Co."

On being recalled in rebuttal, Mr. Lantz testified:

"I heard Mr. Gaines testify, and it is not a fact that the agreement was that he should sell the coal at eight per cent. commission. The price of the coal was not fixed at Cardin at $3.25 per ton and was not allowing him a profit of twenty-six cents a ton for handling it. Understood if he got any more out of it I was not to get any more. He told me he had sold some coal as high as $3.50. As I stated, we needed our money, not in a position to carry it; for that reason we made a flat price of $2.99. Mr. Gaines did not state to me at Dewar that he did not know very much about coal and did not know whether the coal was good or bad. Mr. Gaines recommended himself to me—he had been in the coal business for a good many years, that he could handle the coal in the Miami field, and had a preference of handling coal in that field for the reason of his long experience and dealing in the business and knowing the trade. It is not a fact that Mr. Gaines looked at only four cars: he went over every car of coal in the yard, it was nine or ten. I wouldn't say positive which; also the two cars at the mine. I did not state to Mr. Gaines that Gaines Bros. were handling this coal on commission for me. It was never discussed so far as Skelton and I was concerned, how that coal was handled. I did not say to him that I would like him to get enough out of the coal to pay their commission. I never had but little conversation with him, he told me he was the O. K. & N. agent there, had gone into the coal business for Gaines Bros., selling coal for them on a salary."

W. H. Fursman, testifying as a witness, said substantially as follows:

"I have operated a coal mine in the Henryetta field since 1911. I met Mr. Gaines the latter part of last June or July, the time that he had some dealings with the Monarch Coal Co. At that time he was talking about buying coal from me, and made a statement that he had just purchased some coal from the Monarch Coal Co., through Mr. Lantz. I can't recall the exact conversation, I will tell it as near as I remember it. Mr. Lantz and Mr. Gaines came down to the mine one morning and Mr. Lantz introduced me to Mr. Gaines as being a jobber and coal merchant at Fairland, or Miami, or—anyway, in that district, made a statement that he was down there wanting to buy coal. Mr. Gaines told me of his ability to handle the business, had just purchased coal from Mr. Lantz, and would be glad to handle my coal if I had it. I explained it was tied up on contract with other people, all my coal, I can't remember whether he said 'bought' or 'purchased,' but he told me he had—I expect he said 'buy,' I don't remember whether 'buy' or 'purchase' but that was the idea I had, the idea he left with me, the idea I had of the talk."

J. T. Buckner, being called as a witness, said in substance as follows:

"I am a sales manager for the Consolidated Fuel Companies. About June 20, 1917, I saw Mr. Gaines at Dewar. He was down there to get some coal. We talked in a general way about the coal business. I think he knew my engagements were such I couldn't let him have any myself. I told him there were some operators he might get in touch with, among others, Mr. Lantz. Mr. Lantz came along and I introduced him. I told Gaines that Mr. Lantz had some coal on the track at the time, and Mr. Gaines and Mr. Lantz left me to go down and look at the coal Mr. Lantz had there. After he came back from seeing the coal he said he could use it; said the quality was all right. As near as I can remember, Mr. Lantz had ten or twelve cars on the track at that time. The coal loaded in those cars was mine-run coal, and $2.99 per ton was a reasonable and fair price for that coal at that time, on the track at Dewar, f. o. b. Dewar."

We think it is quite clear that the evidence of the plaintiff reasonably tends to support the findings of fact of the trial court in favor of the plaintiff, and it therefore follows that the 1st, 2nd and 4th assignments of error, supra, are without merit.

The third assignment urged is "That as a matter of law, when the court found that the property was sold and delivered at Dewar, the question of resale on account of defendant passed out of the case, and the admitted acts of Lantz had the legal effect of rescinding the contract of sale, and there could be no recovery."

The trial court specifically found that the contract between the Monarch Coal Mining Co., and Gaines Bros. & Co. was one of sale of mine-run coal for the price of $2.99 per ton f. o. b. the mines at Dewar, Oklahoma, and that under such contract the Monarch Company did deliver to Gaines Bros. & Co., f. o. b. the mines at Dewar, 17 cars of mine-run coal; and that such contract was assigned to the plaintiff bank to the extent of $2,276.45; that the same was made on June 29, 1917, and that on June 30, 1917, the defendant Gaines Bros. & Co. did accept an order of the Monarch Coal Mining Co. upon it, in which order it was directed to pay to the plaintiff bank all sums of money that might be due or become due under and by virtue of the contract; and that Gaines Bros. & Co. became liable to the bank in such sum, and that on the date on which the contract was made, June 20, 1917, the defendant Gaines Bros. Co. paid the sum of $200 to the defendant Monarch Coal Mining Co.; that the defendant Gaines Bros. & Co. failed and refused to accept the 17 cars of coal shipped to it by the Monarch Company, and that the Monarch Company was compelled to and did send its representative to the points of destination of the coal to take charge of the reselling of the coal, and that the expense incurred on that account was $250, and that the defendant Gaines Bros. & Co., on account thereof, was indebted to the Monarch Company in the sum of $50, being the difference between the expenses incurred and the $200 paid at the time the contract was made. The trial court further found that there was 763.36 tons of coal shipped, which, at the contract price of $2.99, amounted to the sum of $2,276.45, and that then the defendant Gaines Bros. & Co. refused to accept and pay for the coal and it became necessary to resell the coal to stop the demurrage thereon, and that Mr. Lantz, acting for the bank and the Monarch Company, sold the same for the sum of $500, which included the coal shipped except one car which had been sold by the defendant Gaines Bros. & Co. previous to that time, and that the $500 so received was credited on the $2,276.45; and a judgment was rendered in favor of the bank and against Gaines Bros. & Co., for the balance and accrued interest, in the sum of $1,878.08.

In the case of White Walnut Coal Co, v. Crescent Coal & Mining Co., 254 Ill, 368, 42 L. R. A. (N.S.) 669, in a similar case to the one at bar, involving the rights of the vendor to resell the property sold on the refusal of the vendee to accept the same, the Supreme Court of Illinois announced the

rule in paragraph 2 of the syllabus as follows:

"That a commodity which one has refused to accept and pay for according to contract has not been produced at the time of repudiation, does not affect the right of the vendor to produce and resell it at the risk of the purchaser."

—and in paragraph 1 of the syllabus it said:

"Resale for the purpose of fixing damages for breach of a contract to purchase products of a mine, need not be made in the market where delivery was to be made under the original contract."

In 2 Benjamin on Sales, the rule is thus stated:

"In making such resale the vendor acts as the agent of the buyer in default. His right and duty are so well stated in Brownlee v. Bolton, 44 Mich. 218, 6. N.W. Rep. 657, we quote what the court says as correct and applicable to this case: 'It is sufficient to say, generally, that the vendor's rights of resale must be exercised in good faith, and in such time and in such manner, and under such circumstances and by such methods as will be best calculated to produce the fair value of the property; and in case he seeks to avail himself of it before a jury it is incumbent on him to adduce the necessary facts to show that in exercising this right this manner was observed.'"

This was cited with approval by the Supreme Court of Alabama in the case of Penn et al. v. Smith et al., 12 South. 820.

In Mechem on Sales, sec. 1638, the rule is stated as follows:

"With respect of place at which the resale should be made, no hard and fast rule can be laid down. A particular place is not to be insisted upon, but good faith and a fair and reasonable endeavor to get the best available price for the goods are essential. The place at which the buyer was to receive the goods is not necessarily the best place for the resale; neither is the nearest market within the state necessarily the most appropriate. Regard must be had for the character of the goods and the times, circumstances, and places that regulate and control their prices."

In the case of Pratt v. S. Freeman & Sons Mfg. Co., 115 Wis. 648, 92 N. W. 368, it was said:

"A resale of property is but the mere means of determining the precise amount of damages by the breach, while the incidental effect is to satisfy the loss suffered by the vendor to the extent of the proceeds from the resale."

In the case of Penn v. Smith, supra, in the body of the opinion the court said:

"The resale may be made at public auction or privately, and it often happens that the goods can best be sold at private sale; but whether on the one mode or the other, in the absence of any instructions from the buyer, the vendor has the right to exercise his discretion within reasonable bounds, and whether this discretion is exercised properly and in good faith are questions of fact for the jury." Citing Lewis v. Greider, 51 N. Y. 231; Mann v. National Linseed Oil Co., 87 Hun, 558, 34 N. Y. Supp. 481.

In the note under White Walnut Coal Co. v. Crescent Coal & Mining Co., supra, subhead 1X (a) the author said:

"Under ordinary conditions, however, where the goods are at the place of delivery at the time the purchaser refused to receive them, the vendor is entitled to and should resell them on the former's account at that place." Citing Clews v. Jamieson, 182 U. S. 461, 45 L. Ed. 1183; Pope v. Filley, 9 Fed. 65, and cases from the Supreme Courts of Ala., Ark., Cal., Ky., Mass., Mich., Mo., N. Y., N. C., Pa., S. C., and Tex.

In pursuance of the foregoing findings, the trial court, on July 16, 1918, rendered judgment as follows: In favor of the plaintiff, Citizens' Bank of Henryetta, and against the defendant Gaines Bros & Co., for the sum of $1,776.45, with interest thereon at the rate of 6 per cent. per annum from July 28, 1917, $102.23, which, added to the principal, is $1,878.68, with interest from date thereof at the rate of 6 per cent. per annum. Judgment in favor of the plaintiff and against the defendant Monarch Coal & Mining Co. for $1,798.45, with interest from July 28, 1917, at the rate of ten per cent. per annum, $169.54, which, added to the principal, makes $1,964.99, with interest thereon at the rate of 10 per cent. per annum. A judgment in favor of the defendant Monarch Coal Mining Co., and against the defendant Gaines Bros. & Co.; in the sum of $50 and for costs, with interest thereon at the rate of 6 per cent. from date.

Rev. Laws 1910, sec. 2843, provides:

"As a general rule compensation is the relief or remedy provided by the law of this state for the violation of private rights, and the means of securing their observance; and specific and preventive relief may be given in no other cases than those specified therein."

Section 2852 provides:

"For the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided by this chapter, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom. No damages can be recovered for a breach of

contract which are not clearly ascertainable in both their nature and origin."

In the case of Callahan & Co. v. Chickasha Cotton Oil Co., 17 Okla. 544, 87 Pac. 331, this court held that this section was declaratory of common-law rule.

We think that the applicable statute governing measure of damages in the instant case is second subdivision of section 2863, Rev. Laws 1910, which is as follows:

"If the property has not been resold in the manner prescribed by section 3850, the excess, if any, of the amount due from the buyer, under the contract over the value to the seller, together with the excess, if any, of the expenses properly incurred in carrying the property to market, over those which would have been incurred for the carriage thereof, if the buyer had accepted it."

Applying the rule here announced to the findings of fact made by the trial court, we find that the invoiced price of the 17 cars of coal, 761.36 tons, at $2.99 per ton, amounted to $2,276.45; that these invoices had been assigned by the seller to the plaintiff bank, and accepted by the buyer, and the bank was entitled to receive payment in said sum, and the court awarded judgment for said sum, with interest thereon at 6 per cent. from date, $102.23, making a total of $2,378.68, less $500, proceeds of the resale, or $1,878.68, as stated above.

The judgment in favor of the plaintiff and against the defendant Monarch Coal Mining Co. was $86.31 in excess of the judgment against Gaines Bros. & Co., which was caused by the difference in the rate of interest, which was 4 per cent. per annum, which, together with the expense incurred account of the resale all being brought about by the failure, as found by the court, of the buyer to accept the shipment, were recoverable under the statute, supra, which the trial court found from the evidence to be $250, and against which the court allowed the defendant Gaines Bros. & Co. credit for $200 cash paid by it at the time the coal was purchased, and rendered judgment in favor of the Monarch Coal Co. for the difference of $50.

We think that the testimony tends to support the foregoing findings of facts, conclusions of law, and the judgments rendered. In these circumstances this court has always held that the judgment of the trial court will not be disturbed on appeal. Elwood Oil & Gas Co. v. Gano, 76 Okla. 287, 185 Pac. 443; Sims v. Ward, 78 Okla. 72, 188 Pac. 884; Foreman v. Needles, 78 Okla.

105, 188 Pac. 1087; Barnett v. Barnett, 78 Okla. 249, 189 Pac. 743.

The judgment of the trial court is therefore affirmed.

HARRISON, C. J., and KANE, MILLER, and KENNAMER, JJ., concur.